\* STATE *ex rel.* HASKELL, *Governor,* v. HUSTON, *Judge, et al.*

No. 314.   Opinion Filed August 29, 1908.   On Rehearing November 10, 1908.

(97 Pac. 982.)

1.   STATES — Powers of Governor — Institution of Actions.   The powers of the Governor are defined by the Constitution.   By that part of article 6, sec. 8, which provides that he shall cause the laws to be faithfully executed, he is empowered to institute a suit for and in the name of the state.

2.   ATTORNEY GENERAL—Powers—Institution of Actions.   Under Wilson's Rev. & Ann. St. Okla. 1903, sec. 6567, the Attorney General has no power to bring suit in the name of the state, or prosecute or defend the same in the district courts of the state, in any civil or criminal cause in which the state may be a party or interested, except when requested by the Governor or either branch of the Legislature.

3.   PROHIBITION—When Writ Issues.   Prohibition is the proper remedy, where an inferior court assumes to exercise judicial power not granted by law, or is attempting to make an excessive and unauthorized application of judicial force in a cause otherwise properly cognizable by it.

(Syllabus by the Court.)

Application by the state, on the relation of C. N. Haskell, Governor, for a writ of prohibition to A. H. Huston, Judge, and Charles West, Attorney General.   Rule made absolute.

On July 28, 1908, the state of Oklahoma at the relation of C. N. Haskell, as Governor, filed in this court a petition, wherein A. H. Huston, judge of the eleventh judicial district, and Charles West, Attorney General, were named as respondents, for a writ of prohibition, in which he states, in substance, that he is, and was at all times thereinafter mentioned, the Governor of the state of Oklahoma; that respondents are, and were during that time respec-

*Appealed to the Supreme Court of the United States.

tively, the judge of the eleventh judicial district and the Attorney General; that theretofore, to wit, on the ——— day of July, 1908, said West, as Attorney General, and as relator, brought suit in the name of the state, as plaintiff, without the direction, request, or authority of relator, against the Prairie Oil & Gas Company, a foreign corporation, to restrain it from committing a nuisance in the alleged improper use of the highways of the state, and to forfeit its charter for an alleged failure to comply with the laws of the state, and oust it from doing business in the state; that on the same day said Huston, as judge of said court, issued a restraining order, as prayed in said suit, pending an application for a temporary injunction, which was set for hearing in Guthrie on July 9, 1908, following; that relator had caused said hearing to be postponed, pending an investigation to be made by him, as Governor; that on investigation he, as Governor, ascertained, and so set forth to the court that it was against the interests of the people of the state that said suit be brought or further prosecuted; that it had been brought by the Attorney General without his knowledge, consent, or request so to do, and had accordingly moved the court to dismiss the same, which said court refused to do, and overruled said motion, and was proceeding, over his objection and protest, and contrary to his wishes as Governor, to hear and determine the same and issue the injunction as prayed by the Attorney General, and prayed the court's writ of prohibition forbidding said Huston, as judge aforesaid, to hold and exercise jurisdiction of said suit, and the said West, as Attorney General, from further prosecuting the same, and for general relief.

A. C. Cruce and Orville T. Smith, for relator.

Charles West, Atty. Gen., and Fielding Lewis, Asst. Atty. Gen. for respondents.

TURNER, J. (after stating the facts as above). In response to the rule of the court to show cause why the writ of prohibition should not issue as prayed, respondents pleaded, inter alia, that relator, as Governor, has no right to bring this suit, and this we will

first determine. The right of the Governor to bring suit in the name of the state, in matters *publici juris,* has been conceded by the courts of last resort throughout this Union ever since the early days of this republic.

*Texas v. White.* 7 Wall. 700, 19 L. Ed. 227, was a suit, in the Supreme Court of the United States, in which the state of Texas claimed certain bonds of the United States as her property, and asked for an injunction to restrain defendants from receiving payment thereon from the national government, and to compel the surrender of the bonds to the state. In 1862 a military board had been established by the Legislature of the state, composed of the Governor, Comptroller, and Treasurer, which was authorized to provide for the defense of the state, by means of any bonds in the treasury, upon any account, to the extent of $1,000,000. The defense contemplated levying war against the United States. After the war was over, there were three governors of the state of Texas, a provisional governor, appointed by the president in 1865, one elected by the people in 1866, and one appointed by the commander of the district, each of whom were exercising the executive function, and actually represented the state in the executive department. This suit was brought by the consent of all three, and the only question before the Supreme Court of the United States preliminary to entertaining jurisdiction in the case was whether or not Texas was a state in the Union. That question being settled, the court proceeded to and did take jurisdiction of the case. The court said: "The necessary conclusion is that the suit was instituted, and was prosecuted, by competent authority." The decision was predicated upon the right which the Governor had, as Governor, incidential to his power as chief executive, when absolutely essential, to protect the rights of the state.

*Kentucky v. Dennison,* 24 How. 66, 16 L. Ed. 717, was an original petition for a mandamus, filed in the Supreme Court of the United States in the name of the commonwealth of Kentucky, by Beriah Magoffin, Governor, for a rule on William Dennison, Governor of Ohio, to show cause why a mandamus should not be

issued by that court, commanding him to show cause why Willis Lago, a fugitive from justice, should not be delivered up to be removed to the state of Kentucky. The court, in discussing the question of jurisdiction, and as to how a state should sue and be sued, said, quoting from *Chisholm v. State of Georgia*, 2 Dall. 419, 1 L. Ed. 440:

"It has been settled by our predecessors, on great deliberation, that this court may exercise its original jurisdiction in suits against a state, under the authority conferred by the Constitution and existing acts of Congress. The rule respecting process, the persons on whom it is to be served, and the time of service, are fixed."

Speaking of the rule as laid down in *Grayson v. Virginia*, 3 Dall. 320, 1 L. Ed. 619, and ever since followed, the court said:

"That when process at common law or in equity shall issue against a state, the same shall be served upon the Governor or chief executive magistrate, and the Attorney General of such state."

. . In speaking as to how suits are entitled when brought by the state, the opinion further says:

"In the case of *Georgia v. Madrazo*, 1 Pet. 110, 7 L. Ed. 73, it was decided that, in a case where the chief magistrate of a state is sued, not by his name as an individual, but by his style of office, and the claim made upon him is entirely in his official character, the state itself may be considered a party on the record. This was a case where the state was the defendant. The practice, where it is plaintiff, has been frequently adopted of suing in the name of the Governor, in behalf of the state, and was indeed the form originally used, and always recognized as the suit of the state. Thus, in the first case to be found in our reports in which a suit was brought by the state, it was entitled, and set forth in the bill, as the suit of *'The State of Georgia, by Edward Tellfair, Governor of said State, Complainant, v. Samuel Brailsford et al.,'* 2 Dall. 402, 1 L. Ed. 433, 438, and the second case, which was so early as 1793, was entitled and set forth in the pleadings as the suit of *'His Excellency, Edward Tellfair, Esq., Governor, Commander in chief in and over the State of Georgia, in Behalf of Said State, Complainant, v. Brailsford et al., Defendants.'*"

The court in closing said:

"We may therefore dismiss the question of jurisdiction without further comment, as it is· very clear that, if the right claimed by Kentucky can be enforced by judicial process, the proceeding by mandamus is the only mode by which the object can be accomplished."

*The state of New Jersey v. State of New York*, 5 Pet. 284, 8 L. Ed. 127, was a bill filed by the former in the Supreme Court of the United States, for the purpose of ascertaining and settling the boundary between the two states. Chief Justice Marshall in passing said:

"The Constitution of the United States declares that 'the judicial power shall extend to controversies between two or more states.' It also declares that 'in cases affecting embassadors, other public ministers, and consuls, and those in which a state shall be a party, the Supreme Court shall have original jurisdiction.' Congress has passed no act for the special purpose of prescribing the mode of proceeding in suits instituted against a· state, or in any suit in which the Supreme Court is to exercise the original jurisdiction conferred by the Constitution. * * * At a very early period of our judicial history suits were instituted in this court against states, and the questions concerning its jurisdiction and the mode of proceeding were necessarily considered. So early as August, 1792, an injunction was awarded, at the prayer of the state of Georgia, to stay a sum of money, recovered by Brailsford, a British subject, which was claimed by Georgia, under her acts of confiscation. This was an exercise of the original jurisdiction of the court, and no doubt of its propriety was ever expressed."

In that case the cases of *State of Georgia v. Brailsford, supra, Oswald v. State of New York*, 2 Dall. 415, 1 L. Ed. 438, *Chisholm, Executors, v. State of Georgia, supra,* and *Grayson v. Commonwealth of Virginia*, 3 Dall. 320, 1. L. Ed. 619, were cited with approval by the court, as indicating the method by which the Governor is permitted to sue or defend, in the name of the state, in the Supreme Court of the United States.

It being thus settled in our mind so far as the right of the Governor is concerned to sue in the name of the state in the fed-

eral courts, let us see whether the Governor has power to bring a
suit in the name of the state, in the courts of the state, as he has
done in the case at bar. 14 Ency. of Law (2d Ed.) 1100, lays down
the general rule:

"The Governor, as special guardian of the state's rights, is the
proper party to initiate necessary litigation. His right to do so is
indeed a part of his general power of supervision over the property
and welfare of the state. Where the Governor brings a suit in be-
half of the state under his official title, the state, and not the Gov-
ernor individually, is the real litigant"—citing authority.

*The Governor v. Allen & McMurdie,* 8 Humph. 176, was a
suit on a bond brought in the circuit court of Montgomery county,
in the name of "A. V. Brown, Governor in and over the state of
Tennessee," against defendant, as surety on a $3,000 bond, given
by one Davis, as trustee for the county and receiver of the school
fund, which should have been made payable to the superintendent
of public instruction and his successors in office, but instead was
made payable "to the Governor in and over the state of Tennes-
see." The question decided by the court was whether the bond,
not being good as a statutory bond, was good as a common-law
bond, to be sued upon in the name of the Governor of the state.
The court held that the suit, in the name of "Aaron V. Brown,
Governor, and successor of James C. Jones," gave no additional
strength to the action which it would not have had provided the suit
had been brought merely in the name of the Governor of the state.
The Supreme Court, in passing, held the bond to be good as a
common-law bond, and that the Governor might properly main-
tain the action, and in passing said:

"Now the Governor constitutes the executive department of
the state. He is vested by the Constitution of the state with great
and important powers, to be executed for the benefit of the state.
* * * The Governor of the state is the executive of it. It is
one of his duties, among many others, to see that the laws of the
state are executed and obeyed. That is a great and fundamental.
duty, without the proper observance of which society might, and
would necessarily be, greatly distracted, and the proper security

of life, liberty, and property seriously endangered for the purpose of enforcing the execution of the laws, and the protection of the state from rebellion and invasion. He is the commander of the forces of the State.    *    *    * "

*State of Louisiana ex rel. Francis C. Mahan v. Antoine Dubuclet, State Treasurer*, 22 La. Ann. 602, was a suit in mandamus, appealed from the Eighth district court, parish of Orleans, in which the lower court directed the writ to issue in favor of the State Tax Collector against the State Treasurer, commanding him to give relator credit for the sum of $140,000, the amount of certain state warrants received by him in payment of taxes. Afterwards the Attorney General left the state, and was not made a party to the suit, and the Governor of the state interfered, in his own name for the state and prosecuted the appeal, and a motion was made to dismiss the appeal on the ground that the Governor was without power to prosecute the same. The court said:

"The appeal was taken by the Governor of the state, whom it is alleged was without power to prosecute this appeal. It is shown that at the time the appeal was taken the Attorney General was absent from the state. This ground is untenable, the Governor being the proper representative of the state, appointed to protect her interests."

*State of Louisiana ex rel. Jacob Strauss v. Antoine Dubuclet, State Treasurer*, 25 La. Ann. 161, appears to have been the same kind of an action, in the same trial court, in which judgment was rendered in favor of relator, from which one appeal was taken by the Attorney General upon the 17th of May, 1872, returnable the third Monday in May, and the other taken by special counsel employed by the Governor on May 18th, returnable first Monday in November. A motion was made to dismiss the second appeal, on the ground that no person was authorized to appeal on behalf of the state, except in cases where the Attorney General is unable or unwilling to act; that such facts did not exist therein, and therefore the Governor was without power to employ counsel. The court, in overruling the motion, said:

"Where there is a doubt as to the jurisdiction of the court, we would maintain our jurisdiction, in a case in which the whole people of the state are interested, and if this were necessary in order to protect them from what might be, and, as in the matter before us appears to be, a fictitious claim upon the common treasury; but in this case we are not called upon to do so. The letter, as well as the spirit, of the law gives us the required jurisdiction. First. It does not follow that, because the state has appealed through the Attorney General, she cannot appeal through the Governor as well. He clearly has the right to appeal, on behalf of the state, and this right cannot be taken away from him simply because another officer of the government has been before him, when he takes the appeal within the delays required by law. In this case the appeal was taken in ample time. Second. It is not legally correct to say that no person is authorized to appeal on behalf of the state, except in cases where the Attorney General is unable or unwilling to act. The prohibition is limited to the employment of counsel other than the Attorney General by the Treasurer and Auditor, and does not exclude the Governor from doing so."

*The State of Florida, at the Relation of Francis P. Fleming, Governor, v. John L. Crawford, Secretary of State,* 28 Fla. 441, 10 South. 118, 14 L. R. A. 253, was an original application for an alternative writ of mandamus, filed in the Supreme Court of that state, to compel the respondent, as Secretary of State, to seal with the great seal of the state, and to countersign a commission appointing Robert H. M. Davidson to be United States Senator for the state of Florida until the next meeting of the Legislature of the state. The peremptory writ was ordered to run, and in passing the court said:

"It is also contended that neither the state nor the Governor has any such interest in relation to the specific act sought to be enforced as authorizes or justifies the institution of this suit. It is entirely clear from the authorities (*Marbury v. Madison,* 1 Cranch, 137, 2 L. Ed. 60, *United States v. Le Baron,* 19 How. 73, 15 L. Ed. 525, and Advisory Opinion, 12 Fla. 686, Id., 15 Fla. 736), and what has been announced in preceding portions of this opinion, that the executive or governmental duty of completing a commission is not consummated until it has been sealed and countersigned. Even admitting that when a commission has been signed

and delivered by the Governor to the Secretary of State, the appointee named therein, who may have previously taken the oath and given bond, or done anything necessary to justify him in entering into the office upon the perfection of the commission, has such a private interest therein as gives him a status to require, through the instrumentality of this writ, the sealing and countersigning, or admitting that the executive power of revoking his action has passed as soon as a commission so signed has been delivered to the Secretary, or even as soon as it has been signed with the intention of such delivery, these positions and concessions, if proper, are in no way inconsistent with, nor do they affect, the interest of the public in the appointment and commissioning of public officers, nor do they remove the fact that the Governor is charged with the 'care that the laws be faithfully administered.' Section 6, art. 4, Const. The commissioning of a public officer is not, at any stage of its progress, a mere matter of private interest. The entire public are directly interested in the consummation of his appointment, in order that he may perform the duties of his office, which duties, and the necessity of the performance thereof to the public, account not only for the appointment, but for the creation of the office itself. Of this interest of the public in having offices filled and commissions sealed and countersigned, or completed, so that the title of the office shall vest in, and the performance of its duties become incumbent upon, the appointees, the Governor is the constitutionally designated representative or trustee of the people, and as such he has the right, and it is his duty, to take such measures as will secure the benefits of the same to the people."

Thus it will be seen that the right of the Governor to bring suit in the name of the state, in all matters *publici juris,* is placed upon the high ground of his duty, under the Constitution of the state, to cause the laws to be faithfully executed, and not upon any statutory ground. The authorities here cited supporting this proposition are based purely upon constitutional provisions independent of statutes. In all our wide range of investigation in this case, we find but one case in which the right of the Governor to sue, in the name of the state, in such matters has been decided adversely to the conclusion here reached, and that is the case of *John J. Henry, Warden of the Penitentiary, et al. v. State of Mississippi,* 87 Miss. 1, 39 South. 856. That was a case brought in

the name of the state of Mississippi, by James J. Vardaman, Governor of the state, as Complainant, against John J. Henry, Warden of the penitentiary and others, including the members of the board of control of the penitentiary (one of which was the Attorney General), and Horace J. McLourin. From a decree overruling a motion to dissolve a preliminary injunction, which had been issued against them, defendants appealed to the Supreme Court. The object of the suit was to restrain defendants, as the board of control of the penitentiary, from entering into a contract alleged to exceed their constitutional and statutory powers. The court was divided in its opinion. The majority was supported by Associate Justices Calhoun and Truly. Mr. Chief Justice Whitfield dissented. The majority held, in effect, that the Governor of the state was without power, under the statute, to bring the suit, and for that reason reversed the case, dissolved the injunction, and dismissed the bill. While conceding the right of the Governor under the Code to sue in the name of the state in foreign jurisdictions, it was denied that the right of the Governor existed to do so in the name of the state in the courts of the state, upon the alleged ground that the statutes of the state of Mississippi did not authorize him so to do. We believe the distinction unwarranted under the law, and refuse to follow the opinion of the court in that case upon this point, but will, on the other hand, follow the great weight of authority as laid down in the cases cited, *supra*. In the dissenting opinion of Chief Justice Whitfield in that case, in which he stood squarely for the right of the Governor to sue in behalf of the state, both in state and federal courts, after an exhaustive discussion as to his right so to do in the former, asks: "How is it as to the power of the Governor to sue on behalf of the state, in the state? This power rests directly upon the language of the Constitution that the Governor 'shall see that the laws are faithfully executed.'" In accordance with the great weight of authority, we conclude that the Governor's right to bring this suit rests on that part of the Constitution of the state of Oklahoma (section 141, Bunn's Ann.

Const.) wherein it is provided "the Governor shall cause the laws of the state to be faithfully executed."

The next question raised in the pleadings is whether the petition states facts sufficient to warrant the issuance of the writ. The petition, among other things, in short, charges the bringing of a certain suit by the Attorney General for and on behalf of the state, in the District Court of Logan county, without being first requested by the Governor so to do, and our first inquiry will be as to whether or not such request was necessary. This is a matter of simple statutory construction. The Constitution of Oklahoma provides (section 134, Bunn's Ann. .Const.) :

"That the executive authority of the state shall be vested in a Governor, Lieutenant Governor, Secretary of State, State Auditor, Attorney General, State Treasurer, Superintendent of Public Instruction, State Examiner and Inspector, Chief Mine Inspector, Commissioner of Labor, Commissioner of Charities and Corrections, Commissioner of Insurance, and other officers provided by law and this Constitution, each of whom shall keep his office and public records, books, and papers, at the seat of government, and shall perform such duties as may be designated in this Constitution or prescribed by law."

Now it is clear that, as the Constitution nowhere designates the duties of the Attorney General, we must look elsewhere to see where they are prescribed by law. Section 2 of the Schedule of the Constitution provides that:

"All laws in force in the territory of Oklahoma at the time of the admission of the state into the Union, which are not repugnant to this Constitution, and which are not locally inapplicable, shall be extended to and remain in force in the state of Oklahoma until they expire by their own limitation or are altered or repealed by law."

Section 6567 of Wilson's Rev. & Ann. St. Okla. of 1903, provides:

"There shall be in and for the territory of Oklahoma an Attorney General who shall be appointed by the Governor by and with the consent of the legislative counsel, who shall hold his office two years and until his successor is appointed and qualified.

He shall be a member of the territorial board of equalization; he shall appear for the territory and prosecute and defend all actions and proceedings, civil or criminal, in the Supreme Court in which the territory shall be interested as a party, and shall also when requested by the Governor, or either branch of the Legislature appear for the territory, and prosecute or defend in any other court or before any officer in any case or matter, civil or criminal, in which the territory may be a party or interested, and shall attend to all civil cases remanded by the Supreme Court to any district court in which the territory is a party or interested."

All that part of the section which prescribes the duties of the Attorney General is locally applicable, and was therefore extended by said section of the schedule. It would seem that a proper construction of the words as used in that section "when requested" should be "if requested," thereby making the right of the Attorney General to bring a suit in the name of the state in the district court to depend, as a condition precedent, upon executive discretion to be exercised by the Governor. We are clearly of the opinion that the word "when," as used in this connection, means no more than "in case" or "if," and this construction is supported by the authorities.

In *Wilkinson v. Estate of Winne,* 15 Minn. 159 (Gil. 123) the court held that the word "when," as used in Pub. St. 1858, c. 44, § 1, providing that it shall be the duty of the court to appoint commissioners when letters testamentary or of administration shall be granted, means no more than "in case" or "if."

In *Hanning v. Nelson,* 20 Ga. 583, the word 'when," as used in the act of 1811, as amendatory of the judiciary act of 1799, which says that when an execution against the body of any defendant shall have been served, such defendant shall be released, provided, etc., is used in the sense of "if" or "whenever."

In *Grimball v. Marshall,* 3 Smedes & M. (Miss.) 359, it was held that the word "when," as used in a statute providing that when any notary public shall protest certain instruments, he shall make and certify on oath a full and true record of what shall have

been done, etc., meant "if," and that in such sense it is generally employed in legislative enactments.

That this is the sense in which this word has been understood as having been used, where similar statutes are in force, there can be no question. In 1889 there was in force in the state of Wisconsin a statute which read:

"It shall be the duty of the Attorney General when requested by the Governor * * * to appear for the state and prosecute or defend in any court or before any officer any case or matter, civil or criminal, in which the state, or the people thereof, may be in any wise interested."

In construing that statute in *Emory v. State,* 101 Wis. 627, 78 N. W. 145, where the Attorney General appeared, on the written request of the Governor, in the district court, to assist the District Attorney of Woods county, it was held by the court that the Attorney General had no discretion in the premises to comply, or to refuse to comply, with the Governor's request, or within the discretion of the circuit court to permit, or refuse to permit, him to participate in the trial. The reasoning and the rule announced in that case supports the contention of petitioner in this case that the Attorney General and the District Court of Logan county are without power or discretion to determine whether this action, instituted by the Attorney General in said court, shall be prosecuted, but that such power and discretion is in the Governor of the state.

The Supreme Court of Kansas in construing an identical statute in the case of *State v. Bowles,* 70 Kan. 821, 79 Pac. 726, 69 L. R. A. 176, has placed upon the word "when" the same construction as here placed by us. In that case defendant was indicted for a statutory crime, the indictment being returned signed "C. C. Coleman, Attorney General of the State of Kansas, Prosecuting in Wyandotte County." There was a motion to quash the indictment because not signed by the county attorney, as required by law. The Attorney General, to justify his conduct, relied upon this statute in force in that jurisdiction at that time,

and the executive requirement upon him to appear and prosecute. The trial court sustained the motion to quash, and the state appealed on a question reserved. The Supreme Court reversed the action of the lower court, and in discussing this proposition said:

"The district court was obliged to take judicial notice of the official character and identity of the Attorney General, and of the executive requirement upon him to appear and prosecute. ' The action of the Governor was a matter of court cognizance, and not a matter for the indictment to express. The Attorney General was no more required to indicate that he was acting under an executive order than the county attorney is required to refer to the fact of his election, the taking of his oath, and the filing of his bond.".

In speaking of the policy of the law in providing for a special prosecutor for the people, the court said:

"They had suffered from the baleful manifestations of sectionalism within the state, as well as between different states, and the purpose was to make the authority of the Governor felt, through its chief law officer, in every part of this territory, if the chief executive or either branch of the Legislature should determine it to be necessary."

Hence we say that the words "when requested by the Governor" should be construed as meaning "if requested by the Governor," which makes the right of the Attorney General to appear for the state and prosecute or defend an action in the district courts of the state to depend upon executive discretion and leave first had and obtained.

*Railroad Tax Cases*, (C. C.) 136 Fed. 233, were several bills, filed by a number of railroad corporations in the United States Circuit Court of Appeals for the Eastern District of Arkansas, to restrain the board of state railroad commissioners from certifying certain assessments made by the board in 1903 and 1904 against the property of the complainants, upon the ground that a number of the attempted assessments were illegal and void. Pending the suit, the board of railroad commissioners came into

court, and showed that, at a meeting of the board held pursuant to law for the purpose of compromising these suits, they made new assessments for those years of the railroad property of the companies in that state, and asked that the action of the board be approved by the court, and a consent decree be entered. The Attorney General appeared, and asked leave to file an intervention on behalf of the state of Arkansas, and that the state be made a party defendant, protesting against the entering of the decree, on the ground, *inter alia,* that the board had no such power. Objection was made to the intervention by both the complainant and defendants. The court sustained the objection upon the ground that the Attorney General, under the Constitution and laws of the state of Arkansas, was not authorized to so appear, and in passing said: "The Constitution of the state provides that the Attorney General shall perform such duties as may be prescribed by law. Article 6, § 22, Const. Ark. We must therefore turn to the statutes of the state to ascertain what duties the Legislature has seen proper to impose upon that officer. Chapter 62, art. 6, Kirby's Dig., defines his duties, and a careful reading will show that the only authority he possesses to represent the state in any court other than the Supreme Court is in *quo warranto* proceedings, and actions to prosecute suits against officers indebted to the state by reason of moneys collected and not accounted for; * * * but counsel has failed to call our attention to any statute, nor has the court been able to find any, making it the duty of the Attorney General, or authorizing him, to appear in trial courts on behalf of the officers of the state, in proceedings of this nature. In the absence of a statute authorizing him to act or appear for the state, the Attorney General is powerless to do so. *Atchison, Topeka & Santa Fe Railroad v. People,* 5 Colo. 63. * * * There being no statute authorizing the Attorney General to appear for the state in the trial court, unless expressly required to do so, and there being no statute authorizing him to enter the appearance of the state for the purpose of having it made a party defendant

to an action pending, by what authority can he do so?"—and refused to permit him to intervene.

And so we say in this case that, as there is no statute authorizing the Attorney General to appear for the state, and bring an action in the District Court of this state other than when requested to do so by the Governor or either branch of the Legislature, and as no such request has been made, we are forced to conclude that the Attorney General was without authority of law to bring the suit complained of. It was not only not his duty so to appear and bring this suit in the District Court, but Wilson's Revised & Annotated Statutes of Oklahoma of 1903, provide (section 1289):

"It shall be the duty of the county attorney of the several counties to appear in the district courts of their respective counties and prosecute and defend on behalf of the territory, or his county, all actions or proceedings, civil or criminal, in which the territory or county, is interested or a party."

This statute was extended and put in force throughout the state by virtue of section 2 of the schedule of the Constitution upon the admission of the state into the Union.

It is a familiar rule of construction, as laid down in the syllabus of *United States v. Weld,* McCahon (Kan., Dassler's Ed.) 591, that:

"When one person, or class of persons, is named in a power of attorney, or an act of the lawmaking power, as being authorized to do a certain thing therein named, all other persons are thereby excluded from doing the same thing as effectually as if they were positively forbidden."

But it is contended, in effect, by respondents that:

"This authority of the Attorney General to bring this action is definitely stated in Wilson's Rev. & Ann. St. 1903, section 4440, as an action to enjoin a nuisance, and by section 4850, Wilson's Rev. & Ann. St. 1903, by the Attorney General of his own motion to oust a foreign corporation."

Otherwise stated, we presume the contention to be that he claims the right, under section 4440 to bring suit of his own mo-

tion in the district court to enjoin a nuisance, and of his own motion in the same court, under section 4850, to bring suit to forfeit a charter and oust a foreign corporation. The question, then, for us to determine, stated in his words, is:

"The question involved in this case is whether or not the Attorney General possesses the authority to institute proceedings of this nature of his own motion, or whether the authority so to do must be first had and obtained from the Governor."

Section 4440 is under the head of "Procedure Civil," and provides:

"* * * An injunction may be granted in the name of the territory to enjoin and suppress the keeping and maintaining of a common nuisance. The petition therefor shall be verified by the county attorney of the proper county or by the Attorney General, upon information and belief, and no bond shall be required."

This section merely has relation to procedure, and in no way extends the duties of the Attorney General beyond those prescribed by section 6567, *supra,* and means no more than that the Attorney General shall verify the petition in such cases as he is requested by the Governor to appear and prosecute.

The next contention is that, under section 4850, Wilson's Rev. & Ann. St. 1903, the Attorney General has a right, of his own motion, to bring a suit in the district court to forfeit a charter and oust a foreign corporation, without authority so to do first had and obtained from the Governor. Said section is also under the head of "Procedure Civil," and relates, together with the two preceding sections, to the civil action provided for in that article. Section 4848 provides that: "The writ of *quo warranto,* and proceedings by information in the nature of *quo warranto,* are abolished, and the remedies heretofore obtainable in those forms may be had by civil action." The next section provides (section 4849): "Such action may be brought in the Supreme Court or in the district court, in the following cases [naming six]:" One is: "Fourth. When any corporation do or admit acts which amounts to a surrender or a forfeiture of their

rights and privileges as a corporation, or when any corporation abuses its power or exercises powers not conferred by law." Another is: "Sixth. For any other cause for which a remedy might have been heretofore obtained by writ of *quo warranto* or information in the nature of *quo warranto.*" The next provides:

"Sec. 4850. When the action is brought by the Attorney General, or the county attorney of any county of his own motion, or when directed to do so by competent authority, it shall be prosecuted in the name of the territory; * * * whenever the action is brought against a person for usurping an office by the Attorney General or the county attorney, he shall set forth in the petition the name of the person rightfully entitled to the office, and his right or title thereto. * * * "

No authority is cited in support of the contention that a proper construction of these statutes gives to the Attorney General the right, of his own motion, to bring suit in *quo warranto* proceedings in the district courts of this state without the authority so to do first had and obtained from the Governor, and we can find none. The writ of *quo warranto* being abolished, and remedies heretofore obtainable in those forms being now made obtainable by a civil action, the action stands on the same footing in the courts as any other, and is commenced and prosecuted in the same way, and no exception to the law as laid down in section 6567 is thereby created.

The *Atchison, Topeka & Santa Fe Railway Company v. People ex rel. Attorney General,* 5 Colo. 60, was a proceeding by information in the nature of *quo warranto,* upon the relation of the Attorney General, in behalf of the state against the Atchison, Topeka & Santa Fe Railway Company, for the alleged usurpation of a corporate franchise in the district court of El Paso county. It was claimed in that case, as is claimed in this case, that independent of the statute, and by virtue of his right so to do under the common law, the Attorney General had a right to bring this action. In passing on this question the Supreme Court reviewed the section of the statute of the state which is practi-

cally the same as section 4208 of Wilson's Revised & Annotated Statute of Oklahoma of 1903, and in effect said that, since the Code had abolished common-law forms of action, and has established single, simple, and universal remedial procedure, called a "civil action," by which rights shall be maintained and duties enforced, the proceeding would not lie, and that:

"It is a general rule that, where a statute provides the remedy to test the right to exercise a franchise or office, it is exclusive of all other remedies. 2 Potter on Corporations, § 665; *Palmer v. Foley*, 36 Super. Ct. (N. Y.) 14. An action for the usurpation of an office or franchise, therefore, is a civil action, under a Code of this state, and must be governed by the rules applicable thereto; must be instituted by filing complaint and issuing a summons, and proceeded with the same as any other civil action."

In sustaining the motion to quash, on the ground that the Attorney General had no power to institute the proceeding, the court further said:

"The duties of the Attorney General are prescribed by General Statutes (Gen. Laws Colo. 1877), sections 1103 to 1108, inclusive. Section 1103 provides: 'The Attorney General shall attend in person at the seat of government during the session of the General Assembly and the Supreme Court, and shall appear for the state, prosecute and defend all actions and proceedings, civil and criminal, in which the state shall be a party or interested, when requested to do so by the Governor or General Assembly, and shall prosecute and defend for the state all causes in the Supreme Court in which the state is a party or interested.' This section limits the duties of the Attorney General to state cases instituted or pending in the Supreme Court of the state, unless it can be said the second clause of the section is intended to include state cases pending in inferior courts. But if this construction be given it, the duty of the Attorney General to appear in state cases pending in inferior courts would still be obligatory only when required to do so by the Governor or General Assembly. There is no claim that the Attorney General in this case instituted the proceeding by request, either of the Governor or General Assembly. In our view the proceeding should have been instituted, if at all, by the district attorney of the par-

ticular district, at his own instance, or upon the complaint of any private party. With this view both the provisions of the general laws and the Code harmonize."

Thus it appears that, although the common law was in force at that time in Colorado, the court denied the right, asserted by the Attorney General, to bring proceedings in the nature of a writ of *quo warranto* under the common law in the district court of that state, but held his duties to be such as were prescribed by the general statutes, and so we will say, with reference to the common-law powers of the Attorney General in this case, as was said by the court in *State v. Bowles, supra,* that: "What, if any, common-law powers he may possess, it is not necessary, in view of the statute to determine."

The court in the case in 5 Colo. 60, then proceeded to quote from the Constitution and the general laws of Colorado applicable to the election, qualification, and duties of the district attorneys of that state, with reference to their duties to appear in behalf of the state, and in the several counties in their districts. which are substantially the same as the duties of the county attorney within their respective counties in this state, and concludes: "Where by statute authority is given to a particular officer, its exercise by any other officer is forbidden by implication. Potter's Dwarris on Stat. 72, 270; *State v. Hastings,* 10 Wis. 525; *Conroe v. Bull,* 7 Wis. 408"—and reversed the action of the lower court in. refusing to quash the proceeding, with directions that the same be dismissed.

Viewing this controversy, then, in the light of what we have just held, we see that the statute clearly contemplates that the Governor, and not the Attorney General, shall exercise the discretion, and determine whether or not this suit should have been brought by the Attorney General in the district court. The exercise of this power is the exercise of executive discretion, and it is clear as laid down in *Mott v. Martin,* 12 Wheat. 19, 6 L.

Ed. 537, where Mr. Justice Story, speaking of the powers of the President, said:

"Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction that the statute constitutes him the sole and exclusive judge of the existence of those facts."

With the exercise of this discretion by the President, or a Governor of a state, the judicial department of the government has nothing to do, and will not interfere in the exercise of the power so conferred.

In *Marbury v. Madison,* 1 Cranch, 138, 2 L. Ed. 60, Mr. Chief Justice Marshall, speaking for the court said:

"By the Constitution of the United States the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character and to his own conscience. To aid him in the performance of these duties he is authorized to appoint certain officers, who act by his authority, and in conformity with his orders. In such cases their acts are his acts, and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They represent the nation, not individual rights, and, being intrusted to the executive, the decision of the executive is conclusive."

It is useless to cite further authority in support of so well established a doctrine. It will thus be seen that the District Court of Logan county, in continuing to assert jurisdiction over the suit complained of, after it had been legally informed by the motion to dismiss, filed by the Governor, that the suit was brought without executive request, was, proceeding without jurisdiction, in that it was unwarrantably interfering with executive discretion, in the exercise of which he was entirely independent of the control of the judiciary, and it only remains for us to determine whether the writ of prohibition is the proper remedy to keep the District Court of Logan county within its lawful limits. Of this we think there can be no serious doubt.

The Constitution (article 7, section 2) provides:

"The original jurisdiction of the Supreme Court shall extend to the general superintending control over all inferior courts and all commissions and boards created by law. The Supreme Court shall have power to issue writs of *habeas corpus*, mandamus, *quo warranto, certiorari*, prohibition, and such other remedial writs as may be provided by law, and to hear and determine the same. * * * *"

High's Extraordinary Legal Remedies (2d Ed.) says, in speaking of this writ:

"Sec. 781. The province of this writ is not necessarily confined to cases where the subordinate court is absolutely devoid of jurisdiction, but is also extended to cases where such tribunal, although rightfully entertaining jurisdiction of the subject-matter in controversy, has exceeded its legitimate powers. And where, after a conviction for felony, the court has, at a subsequent term granted a new trial upon the merits, without any legal authority for so doing, an appropriate case is presented for interference by prohibition, even though the original trial and conviction were fully within the jurisdiction of the court. So when a court is proceeding to enforce a peremptory writ of mandamus, which has been suspended by an appeal, prohibition will lie to prevent its enforcement. So the writ has been allowed where the court below had grossly transcended the bounds prescribed by law, and had committed an error in a criminal cause, apparent on the face of the record, and involving a question of life and death. Thus, where a court had erroneously convicted a person and passed sentence of death upon him for an offense not capital, the error appearing upon the face of the proceedings, and there being no further means of correcting it, prohibition was granted."

But it is contended, in effect, that relator, having invoked the aid of the Logan county district court by filing a motion to dismiss the suit complained of, thereby submitted himself to the jurisdiction of that court, and cannot afterwards be heard to invoke this writ. In this we cannot concur.

*Ingersoll v. Buchanan et al.*, 1 W. Va. 181, was a *supersedeas* to a judgment of the circuit court of Ohio county dismissing a

rule awarded plaintiff in error against defendants in error to show cause why a writ of prohibition should not issue against them. The facts were that C. Buchanan, surveyor of roads in a certain magisterial district, road district No. 2, in Marshall county, as such, brought suit in Ohio county, before an alderman in the city of Wheeling, as *ex officio* justice of the peace therein, for $12.50 on account of a road tax assessed against the plaintiff in error in Marshall county, who was a resident of said city, upon land owned by him in said road district in Marshall county. Judgment was rendered in favor of C. Buchanan, one of the defendants in error, from which plaintiff in error appealed to the county court of Ohio county, which affirmed the judgment of the justice of the peace, and awarded execution against plaintiff in error. He then applied by petition to the judge of the circuit court of Ohio county for a writ of prohibition, upon which a rule ran against said Buchanan and the sheriff and justice of Ohio county to show cause why the writ should not issue. On hearing the court discharged the rule, and plaintiff in error appealed. The Supreme Court, in awarding the writ said:

"It was further objected for the defendants in error that the plaintiff in error, by appealing from the judgment of the justice of the county court of Ohio county, thereby submitted himself to its jurisdiction, and, having invoked its aid, could not afterwards be heard to question its judgment in the premises. In reply to this objection it was alleged for the plaintiff in error that, if the county court of Ohio had not jurisdiction by law, it could not be conferred by the consent of the plaintiff. The correctness of this is too well settled to require comment. The question then to consider is, had the alderman, as justice of the peace, an office in Ohio county, jurisdiction to try the case?"

After determining that he had not, the court proceeded:

"The jurisdiction exercised by the justice in this case was therefore an assumption, and without authority of law. And the jurisdiction exercised in the case by the county court of Ohio in affirming the judgment of said justice was equally an assumption, and without authority of law. The writ of prohibition is the conservative instrument in the hands of the superior courts by which

to restrain the inferior tribunals to their lawful limits, and should have been awarded in this cause by the circuit court, instead of dismisisng the rule as it did."

In *State ex rel. Dawson v. St. Louis Court of Appeals,* 99 Mo. 216, 12 S. W. 661, the court, in its syllabus, lays down the rule thus:

"The purpose of the writ is to prevent an inferior tribunal from assuming a jurisdiction with which it is not legally vested, or where, having jurisdiction, it has exceeded its legitimate powers, and especially in the latter class of cases where there is no remedy by appeal."

*St. Louis, etc., T. R. Co. v. Wear,* 135 Mo. 230, 36 S. W. 357, 658, 33 L. R. A. 341, was an original application in the Supreme Court for a writ of prohibition against the enforcement of certain orders entered by the circuit judge of the twenty-second circuit in vacation appointing a receiver. The court held that the order was made without authority of law, and said:

"Where a court or judge assumes to exercise a judicial power not granted by law, it matters not (so far as concerns the right to a prohibition) whether the exhibition of power occurs in a case which the court is not authorized to entertain at all, or is merely an excessive and unauthorized application of judicial force, in a cause otherwise properly cognizable by the court or judge in question. *State ex rel. v. Walls,* (1892) 113 Mo. 42, 20 S. W. 833; *In re Holmes* (1894) 1 Q. B. (1895) 174. \* \* \* If the facts shown by the record reveal an unwarranted application of judicial power, causing an immediate and wrongful invasion of rights of property, the writ of prohibition may go to check the execution of any unfinished part of the extra-jurisdictional program that may have been outlined. \* \* \* The summary order for the seizure of the property in possession of the new Kennett Road was, we think, in excess of the rightful power of the learned circuit judge in vacation. We hence consider that the rule in prohibition should be made absolute, and direct that judgment for a peremptory writ be entered. \* \* \*"

Whether the district court of Logan county, in the absence of the request of the Governor on the Attorney General to bring the suit complained of, ever had jurisdiction to entertain the

suit is a question upon which we express no opinion, but certain it is that, after being legally informed, by the motion filed by the Governor, to dismiss that suit on the ground that it was brought by the Attorney General without the request of the Governor, it was without jurisdiction to proceed further in the case. In other words, the motion to dismiss terminated any jurisdiction which the court might have theretofore had in the premises.

*Fayerweather v. Munson,* 61 Conn. 431, 23 Atl. 878, was an application to the superior court of New Haven county for a writ of prohibition. It stated, in substance, that one of the applicants, the Goodyear India Rubber Glove Manufacturing Company, had attached the property of the Union Waterproof Shoe Company for debt; that afterwards the other applicant, Fayerweather & Ladew, filed a petition in the probate court for the district of New Haven, praying that said Waterproof Shoe Company be adjudged insolvent, and a trustee appointed, upon which said court issued an order requiring the latter company to appear and show cause for trial upon November 4, 1891; that on November 3, 1891, no other creditor having intervened, said Fayerweather & Ladew made a satisfactory arrangement with said attaching creditor, withdrew the petition from the court, and said petition was no longer pending; that on November 4, 1891, defendants made application to the judge of the probate court to revive the petition, and permit them to intervene and procure the appointment of a trustee thereunder for reasons stated, they being creditors, and thereupon the judge undertook to revive the petition and allow such intervention, which procedure, it was charged, was without jurisdiction, and prayed for a rule to show cause. The Superior Court on hearing discharged the rule and dismissed the application. The Supreme Court after, in effect, holding that the probate court had jurisdiction to entertain the petition of Fayerweather & Ladew, and they, on the adjustment of their indebtedness at any time before the intervention of any other creditor, had a right to withdraw the same, said: "Why, then, are not the allegations of the plaintiff's complaint that on the 3d

day of November, 1891, no other creditor having intervened, the plaintiffs withdrew the petition, and by a writing duly signed and filed in the court of probate, and thereupon disappeared from the court, and said petition was no longer pending therein, sufficient to show that on said 4th day of November the court of probate was without jurisdiction? In our opinion they are sufficient. There is no reason why the right to withdraw an action, in the absence of statutory provision to the contrary, should not exist in a court of probate as fully as in other courts, where the existence of such right has often been affirmed. *Bulkley v. Treadway*, 11 Root (Conn.) 552; *West v. Tolland*, 25 Conn. 133; *Anderson v. Gregory*, 43 Conn. 61, 63; *Moriarty v. Mason*, 47 Conn. 436; *Main v. Main*, 48 Conn. 301"—and ordered the writ to issue.

We are therefore of the opinion that the rule in prohibition should be made absolute, and direct that judgment for a peremptory writ be entered in accordance with this opinion. It is so ordered.

All the Justices concur.

---

## ON REHEARING.

TURNER, J. We have carefully re-examined the various propositions raised in this case by the respondents in their petition for rehearing; and, after diligent research and investigation, we find that, where it is held that the Attorney General may, independent of express enactment, exercise common-law powers in addition to the duties imposed upon him by statute, it is either in those states derived from the original colonies, where the office of Attorney General existed as at common law, and was continued after the independence of the colonies, such colonies or states, as a rule, creating or continuing the office, using the term as under the common law, or in states where the office was created by

the Constitution or legislative enactment, without the duties thereof being defined or referred to. In such cases the courts have held that, where the office of Attorney General was created without reference to the duties thereof, the term was used in its common-law acceptation.

For instance, the Attorney General in his brief cites the case of *Hunt, Attorney General, v. Chicago Dummy Railroad Co.,* 20 Ill. App. 283, affirmed in 121 Ill. 638, 13 N. E. 176. In that state (see Const. 1870, art. 5) the office is created by the organic law, without reference to the duties thereof. In such case we can see how a court could very properly hold that the powers of the Attorney General were such as at common law, supplemented by statute.

Also in the case of *People v. Stratton,* 25 Cal. 242, it was held that the Attorney General *ex officio* might exercise common-law powers in addition to those prescribed by statute. But in the Constitution of 1849, which was then in force, the office of Attorney General is created without reference to his duties. The case of *People v. Gold Run Ditch & Mining Co.,* 66 Cal. 138, 4 Pac. 1152, 56 Am. Rep. 80, is to the same effect. The Constitution of 1879 was then in force, but the office of Attorney General was continued without any reference being made to its duties. The correct rule appears to be that, where the office of Attorney General is created in states where the common law prevails, without any reference to the duties of such office, the word is used with its accepted meaning under the common law, and carries with it such duties and powers as were usually incident to the office of Attorney General in England under the common law, when not locally inapplicable.

The Constitution of Minnesota makes no reference to the duties of the Attorney General (see article 5, Const. 1857), and in that state the courts have held that he may exercise common-law powers.

The case of *State of Florida ex rel. Meek, Attorney General, v Gleason,* 12 Fla. 212, is a decision rendered by the reconstruc-

tion courts, whose decisions have never been regarded in that state, since that period, as authority. However, the Constitution of 1868, which was in force when that decision was rendered, does not prescribe or refer to in any way the duties of the Attorney General.

The Constitution of Nebraska (article 5, Const. 1875), does not attempt, in any way, to prescribe the duties of the Attorney General, but provides that he shall perform such duties as may be required by law. The case of *State v. Stein*, 13 Neb. 530, 14 N. W. 481, is cited in support of the proposition that the Attorney General, in addition to his duties prescribed by statute, may exercise common-law powers. In that case an information in the nature of *quo warranto* was instituted by a private person in the Supreme Court to oust another from office. The court dismissed the information, because it failed to state facts sufficient to constitute a cause of action, and in passing construed the statute of that state, and declared that the same had not changed the common-law rule, making it the duty of the Attorney General to file the information on his own motion, where the state at large was interested, but had changed it so as to permit prosecuting attorneys to institute such proceedings in cases arising in their respective districts. Under section 1, art. 5, c. 83, p. 596, Compiled Statutes of Nebraska, annotated 1881, which were in force when said decision was rendered, it is provided:

"The Attorney General shall appear for the state, and prosecute and defend all actions and proceedings, civil or criminal, in the Supreme Court, in which the state shall be interested or a party, and shall also, when requested by the Governor, or either branch of the Legislature, appear for the state and prosecute and defend in any other court, or before any officer, any cause or matter civil or criminal, in which the state may be a party, or interested."

This section was adopted in Nebraska in 1869 (Laws 1869 p 165, § 3), and was probably borrowed from the statutes of Kansas. It will be seen that by the statute in Nebraska the Attorney

General was empowered to institute such action on his own motion, in the name of the state, in the Supreme Court, and that informations should be filed against any person unlawfully holding or exercising any public office or franchise within that state, or any office in any corporation created by the laws of said state, or when any public officer has done or suffered any act which works a forfeiture of his office, or when any persons act as a corporation within said state without being authorized by law, or if, being incorporated, they do or omit acts which amount to a surrender or forfeiture of their rights and privileges as a corporation, or when they exercise powers not conferred by law, by the prosecuting attorney of the proper county whenever he deems it his duty to do so. Sections 704, 705, art. 23, of the Nebraska Code of Civil Procedure; Compiled Statutes of Nebraska, Annotated 1881, p. 620. It is further provided by section 706 of the Nebraska Civil Code of Procedure (Comp. St. 1881, p. 621), that the county attorney shall file such information, when directed to do so by the Governor, the legislative assembly, or the district court. In the case of *State v. Stein, supra,* it is said:

"Our statute has not changed the common law in that regard as to the law officer of the state, except that it permits prosecuting attorneys to institute proceedings on cases arising in their respective districts. But where the state at large is interested the Attorney General, as at common law, is the proper party."

The Supreme Court in that state has original jurisdiction in actions in the nature of *quo warranto. State ex rel. Valentine v. Griffey,* 5 Neb. 161. In the case of *State ex rel. Crosby v. Cones,* 15 Neb. 444, 19 N. W. 682, it is declared that the Attorney General is the proper officer to institute proceedings in *quo warranto* in the Supreme Court, and not the district attorney. It nowhere appears that it has ever been held in Nebraska that the Attorney General may exercise common-law powers in addition to those prescribed by statute; the courts holding, however, that the Attorney General was the proper person to institute suits on

his own motion, as the law officer of the state, in actions where the state at large was interested in the Supreme Court.

Even if the Attorney General has power as at common law, supplemented by our statute, still in that event the Governor would have the right to direct and control the bringing of suits in the district court by him.

In the case of *State v. Southern Pacific Railway Co.*, 24 Tex. 117, Mr. Justice Roberts, in a very elaborate opinion says:

"In England the King could direct and control the bringing of suits, by his direct control over the officer who might be Attorney General. In this state such direct control, as a legal power, is cut off by the independence of the law officers of the state."

The Constitution of the state of Texas (1845) which was in force when the opinion in the case of *State v. Southern Pacific Railway Co., supra*, was delivered, provided:

"The Attorney General * * * shall represent the state in all suits and pleas in the Supreme Court of the state in which the state may be a party, and shall specially inquire into the charter rights of all private corporations, and from time to time, in the name of the state, take such action in the courts as may be proper and necessary to prevent any private corporation from exercising any power or demanding or collecting any species of taxes, tolls, freight or wharfage not authorized by law. He shall whenever sufficient cause exists, seek a judicial forfeiture of such charters, unless otherwise expressly directed by law, and give legal advice in writing to the Governor and other executive officers, when requested by them, and perform such other duties as may be required by law. * * *" (Const. 1845, art. 4, § 22).

And this provision is contained in the Constitution of Texas of 1875. In none of the Texas cases is there any intimation that the Attorney General in that state has any authority by virtue of the common law; his duties being prescribed by the Constitution and the statutes. *State v. Farmers' Loan & Trust Co.*, 81 Tex. 546, 17 S. W. 60; *State v. Moore*, 57 Tex. 309; *State v. Southern Pacific Railway Co.*, 24 Tex. 117. In the case of *State v. Southern Pacific Railway Co., supra*, it was held that the dis-

trict attorney might institute a suit in the district court to for-
feit the charter of · a corporation, declaring that it more appro-
priately fell within the province of the district attorney to prose-
cute such action, or any other action on the part of the state in
the district court, than that of the Attorney General; but the
court failed to pass on the question as to whether or not the At-
torney General could maintain such action, without express stat-
ute authorizing him so to do. At the time the opinions were an-
nounced in the cases of *State v. Southern Pacific Railway Co.,*
*State v. Moore,* and *State v. Farmers' Loan & Trust Co., supra,*
there was no statute in force in Texas providing that the Attorney
General should, when requested by the Governor, appear in be-
half of the state and prosecute or defend in any court, or before
any officer, in any cause or matter, civil or criminal, in which the
state might be a party or interested. His duties were prescribed
by the Constitution as supplemented by statute.

In the state of Kansas there are statutes in force relating to
the duties of the Attorney General, substantially the same as sec-
tions 6567, 6568, 6569, 6570, 6571, 6572, and 6573, Wilson's Rev.
& Ann. St. Okla. 1903 (sections 6616, 6617, 6618, 6619, 6620,
6621, 6615, Gen. St. Kan. 1889). Section 1289, Wilson's Rev.
& Ann. St. Okla. 1903, provides that:

"It shall be the duty of the county attorney of the several
counties to appear in the district courts of their respective coun-
ties, and prosecute and defend, on behalf of the territory [state],
or his county, all actions or proceedings, civil and criminal, in
which the territory [state] is interested or a party; and when-
ever the venue is changed in any criminal case, or in any civil
action or proceeding in which his county or the territory [state]
is interested or a party, it shall be the duty of the county attorney
of the county where such indictment is found, or the county in-
terested in such civil action or proceeding, to appear and prosecute
such criminal indictment, and to prosecute or defend such civil
action or proceeding in the county to which the same may be
changed."

Substantially the same section appears as section 1796 of

the General Statutes of Kansas of 1889. Section 1798 of the General Statutes of Kansas of 1889 is substantially the same as section 1291 of Wilson's Revised & Annotated Statutes of Oklahoma of 1903.

In the year 1885 the Legislature of Kansas, with a view to the more effectual enforcement of the prohibitory law, provided that whenever the county attorney shall be unable, or shall neglect or refuse, to enforce the prohibitory liquor law in his county, it shall be the duty of the Attorney General to enforce the same, and that he and his assistants were authorized to sign, certify, and file all such complaints, informations, petitions, and papers as the county attorney is authorized to sign, verify, or file. Previous to that time it was the undoubted purpose of the lawmakers in the state of Kansas that, except when the Governor or either branch of the Legislature should determine it was necessary, the enforcement of the law and the redress of public wrongs should be left to the local county or district officers, recognizing the force of the doctrine of local self-government. But when the prohibitory law in Kansas was enacted, the difficulty of enforcement by the local county and district officers was made manifest, and it was then by legislative enactment declared to be the duty of the Attorney General to participate in such enforcement.

Sections 95, 96, 97, 98, 99, 100, and 101 of the Compiled Laws of Dakota Territory of 1887 are identical with sections 6567, 6568, 6569, 6570, 6571, 6572, and 6573 of Wilson's Revised & Annotated Statutes of Oklahoma of 1903, and were probably transplanted substantially from the state of Kansas to that territory; section 6616 of the General Statutes of Kansas having been enacted by the Legislature of that state on June 12, 1861, about the time that Dakota was organized into a territory. Section 428, Compiled Laws of Dakota Territory of 1887, provides that "it shall be the duty of the district attorney of the several counties to appear in the district courts of their respective counties, and prosecute and defend on behalf of the territory, or his county, all actions or proceedings, civil and criminal, in which the territory

or county is interested or a party; and whenever the venue is changed in any criminal case, or in any civil action or proceeding in which the county or the territory is interested or a party, it shall be the duty of the district attorney of the county where such indictment is found, or the county interested in such civil action or proceeding, to appear and prosecute such indictment, and to prosecute or defend such civil action or proceeding in the county to which the same may be changed." And sections 429, 430, 434, 435, 436, 437, and 438 are identically the same as sections 1290, 1291, 1293, 1294, 1295, 1296, and 1297 of Wilson's Revised & Annotated Statutes of Oklahoma of 1903, except that in the former the words "district attorney" appear where the words "county attorney" appear in the latter.

In the case of *State v. Bowles,* 70 Kan. 826, 79 Pac. 726, 69 L. R. A. 176, Mr. Justice Burch, in delivering the opinion of that court, commented on the reason for extending the authority of the chief law officer of the state, to wit, the Attorney General, to every part of its territory, if the chief executive, or other branch of the Legislature, should determine it was necessary, and said:

"The experience of the Legislature during the territorial times had taught them the necessity of a state government equipped with sufficient power to protect public rights and redress public injuries throughout the entire state, independent of the attitude of local authorities, who might be indifferent, incapable, or even antagonistic."

He further added:

"When directed by the Governor or either branch of the Legislature to appear and prosecute criminal proceedings in any county, he [the Attorney General] becomes the prosecuting attorney of that county in those proceedings, and has all the rights that any prosecuting officer there may have, including those of appearing before the grand jury, signing indictments, and pursuing cases to final determination."

It is apparent, when we look at the history of such provisions, whence they came, and their practical application, that it was originally the intention to leave the administration of the govern-

ment in the hands of the people, as near as practicable; that the
law should be enforced by the officers nearest to the people and
directly responsible to such county or district. When experience
in Kansas showed that exigencies might arise requiring different
application, provision was made by statute, not by judicial en-
actment, that the Attorney General should, when requested by the
Governor or either branch of the Legislature, appear and prosecute,
or defend, any action or proceedings, civil or criminal, in which
the state should be interested or a party. Hence, we are confirmed
in our previous conclusion that it was not the intention of the law-
makers that the Attorney General should have control of liti-
gation in which the state was interested or a party, either civil
or criminal, in the district courts of the state, except when re-
quested by the Governor, or either branch of the Legislature.

The question involved before us is simply one of law, not of
policy. It is our duty to declare the law as we find it, whether
or not we agree as to its policies or purposes. If the law does
not meet the approval of the people, they alone, either through
the Legislature or the initiative, have the power to change it, not
the courts. Judicial legislation is not in accord with popular in-
stitutions. Everything in nature legislative, when not incidental
to judicial administration, is by express organic provision denied
to the judiciary. Section 1, art. 4 (Bunn's Ed.) § 50, Const.; *In re
Petition Com'rs Pontotoc County* (not yet officially reported) 98
Pac. 557. However, in our judgment, the county attorney of any
county, where proper service may be had in such county, has the
right to institute such an action in the name of the state, on his
relation, as was begun in the Logan county district court in the
name of the state, on the relation of the Attorney General, to have
the charter of the Prairie Oil & Gas Company, canceled, which ac-
tion on the part of such county attorney would neither be sub-
ject to the control of the Governor, nor to be dismissed at his dis-
cretion. The statutes heretofore referred to appear to make the
Attorney General the legal adviser of the state officers, and the
proper person to prosecute and defend actions in the Supreme

State *ex rel.* Haskell, *Governor*, v. Huston, *Judge, et al.*

Court in which the state is a party or interested, and, when directed by the Governor or either branch of the Legislature, to appear and prosecute or defend any action, civil or criminal, in any court, or before any officer, in which the state is a party or interested, and that it is the duty of the county attorney, except as otherwise provided, to prosecute and defend all actions, both civil and criminal, in the district or county courts, in which the state is a party or interested.

As to whether or not the rights of the people of the commonwealth are properly safeguarded in lodging this power in the local prosecuting attorneys, to bring such action in the district, or other local courts, except when the Attorney General is directed so to do by the Governor, it is not for us to determine. This is a legislative power and policy, and not within the province of the judiciary.

The petition for rehearing is denied.

Williams, C. J., and Dunn, J., Concur; Kane and Hayes, JJ., concur in the conclusion.